390 So.2d 344 (1980)
Donald Alan SHAPIRO, Appellant,
v.
STATE of Florida, Appellee.
No. 54097.
Supreme Court of Florida.
November 13, 1980.
*346 Bernard S. Yedlin, Miami, for appellant.
Jim Smith, Atty. Gen., and Steven R. Jacob, Asst. Atty. Gen., Miami, for appellee.
ALDERMAN, Justice.
We have for review by direct appeal Donald Shapiro's conviction for possession of cocaine. Because the trial court upheld the constitutional validity of sections 893.13 and 893.03(2)(a)(4), Florida Statutes (1977), part of the "Florida Comprehensive Drug Abuse Prevention and Control Act," we have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution (1972).
In the trial court, by motion to dismiss, Shapiro challenged the constitutionality of these statutory sections, and, by motion to suppress, he challenged the admissibility of 6.5 pounds of cocaine seized by an airport security detective from his suitcase at the security boarding area of the airport. Both motions were denied, and he then pled nolo contendere expressly reserving the right to appeal the constitutional and the suppression questions. We hold that the challenged statutes are constitutional and that the trial court's denial of the motion to suppress was proper, and we therefore affirm Shapiro's conviction and sentence.
Shapiro's constitutional attack on sections 893.13 and 893.03(2)(a)(4) is totally without merit and warrants only brief discussion. The inclusion of cocaine within the statutorily prohibited class defined in section 893.13 is not arbitrary and unreasonable, does not violate Shapiro's right to equal protection of the laws, does not render the statute overbroad, does not invade Shapiro's right of privacy, and does not violate his right to be free from cruel and unusual punishment. Cf. Hamilton v. State, 366 So.2d 8 (Fla. 1978), wherein we upheld the inclusion of marijuana within section 893.13 against similar constitutional challenges.
Shapiro's challenge to the trial court's order denying his motion to suppress is also without merit but warrants more extended discussion. First, we note that the trial court's conclusions of fact come to us clothed with a presumption of correctness, and, in testing the accuracy of these conclusions, we must interpret the evidence and all reasonable deductions and inferences which may be drawn therefrom in the light most favorable to the trial judge's conclusions. State v. Nova, 361 So.2d 411 (Fla. 1978). In that light, the record of the motion to suppress hearing reveals the following pertinent facts. Having arrived at the Miami International Airport and having had purchased for him an airline ticket, Shapiro and two other men proceeded to the coin lockers at the airport terminal. Therein, they placed a bag. Shapiro then, in a rather suspicious manner which attracted the attention of a detective of the Dade County Public Safety Department assigned to the airport, handed the key to one of the two other men. Because of several other unusual actions by Shapiro observed by the detective for a period of at least fifteen minutes, the detective approached Shapiro and asked him for identification. Appearing extremely nervous, Shapiro produced a driver's license in his own name and produced an airline ticket in another name. When questioned as to the discrepancy, he informed the detective that the airline had made a mistake. Fearing that Shapiro had placed an explosive device in the locker, the detective asked Shapiro whether he could search the locker. Shapiro told him that if *347 the detective could locate the key to the locker, he could search it. The key, however, was not located. The detective also requested that Shapiro permit him to search the suitcase which Shapiro intended to carry onto the plane, but Shapiro refused. Although he was still suspicious, the detective told Shapiro that he was free to leave.
The detective then followed Shapiro down the concourse to the security boarding area of the airport. When Shapiro's suitcase was passed through the x-ray monitor, the guard at the security check station noticed something that looked like scissors. The detective, who was also watching the monitor, observed a gray mass which was approximately a foot to a foot and a half in length and eight inches in width. He requested that the bag be passed through again and that the guards take a closer look because he had a genuine fear that there was an explosive device in the suitcase. Viewing the monitor, the detective could distinguish that the mass was not clothing and that it could be plastic explosives. When the suitcase was opened by Shapiro so that the security guard could check the scissors, the detective saw a bulge in a pants leg which he thought was a bomb. He, therefore, removed the pants from the suitcase. The search, however, rather than revealing the presence of a bomb, turned up the 6.5 pounds of cocaine.
The trial court, having considered the totality of the circumstances surrounding the search and seizure of the cocaine, concluded that the detective had acted reasonably.
Shapiro contends that the search and seizure violated his fourth amendment rights and that the cocaine should have been suppressed because the detective did not have sufficient probable cause to search his luggage. For several reasons, we hold that probable cause was not a prerequisite to this search in the security area of the airport, conducted for the limited purpose of discovering weapons, explosives, or other devices which could have been utilized to hijack an airplane.
In order for Shapiro to claim that his fourth amendment rights were violated, he must first establish that he had a reasonable expectation of privacy to be free from this particular intrusion by the detective. United States v. Salvucci, ___ U.S. ___, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A reasonable expectation of privacy under a given set of circumstances depends not only upon one's actual subjective expectation of privacy but also upon whether society is prepared to recognize this expectation as reasonable. Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Here, the defendant clearly failed to demonstrate that he had a reasonable expectation of privacy to be free from the particular intrusion involved in this case-a search for what the detective thought was a bomb. Shapiro testified that since 1971, he had boarded airplanes at least twenty times and that he was aware that there is a checkpoint at every airport where carry-on baggage must be submitted for inspection. He further testified that he had seen baggage opened at the security stations and that he was fully aware that his could be opened. He knew that for his protection and for the protection of other air passengers, searches were conducted to prevent prospective hijackers from boarding airplanes. By his own testimony, he established that he had no subjective reasonable expectation that his baggage would not be searched.
Additionally, we conclude that even if Shapiro had some subjective expectation of privacy, society is not prepared to recognize such expectation as reasonable. At this point in time when airplane hijacking is at a crisis level, such an expectation, to be free from the limited intrusion brought about by the screening process utilized in the boarding area of the airports, is not justifiable under the circumstances. One who enters the boarding area of the airport knows or should know that he is subject to being searched for weapons or other devices which could be used for hijacking. Notices *348 posted in front of boarding areas inform prospective air passengers that all are subject to anti-hijacking searches. These searches are not directed against individuals but rather are a part of a general screening process to avoid the carrying of weapons or explosive devices onto an aircraft.
Since Shapiro did not demonstrate that he had a reasonable expectation of privacy, the fourth amendment is not implicated, and probable cause was not requisite to justify the search.
Alternatively, assuming that Shapiro's fourth amendment rights were implicated in this search, we find that the present search conducted for the limited purpose of preventing an airplane hijacking was proper under the fourth amendment. Two separate concepts justify this finding.
One of the exceptions to the fourth amendment requirement of a probable cause basis for a search is a search conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). This consent must be free and unconstrained, and the question of voluntariness is a question of fact to be determined from the totality of the circumstances. See Norman v. State, 379 So.2d 643 (Fla. 1980). Analyzing in depth the subject of consent searches, the Supreme Court of the United States in Schneckloth determined that while knowledge of the right to refuse consent is a factor to be taken into account, the government need not establish such knowledge as an indispensable requisite to effective consent. The Court refused to extend the requirement of a knowing and intelligent waiver to the constitutional guarantee against unreasonable searches and seizures since, it explained, the protections of the fourth amendment have nothing to do with promoting the ascertainment of truth at a criminal trial. 412 U.S. at 241-42, 93 S.Ct. at 2055. See also Interest of R.L.J., 336 So.2d 132 (Fla. 1st DCA 1976).
Looking to the totality of the circumstances in the present case, we find that Shapiro voluntarily consented to the search. As previously stated, he was fully aware that upon entering the security boarding area of the airport, he was subject to a security search for weapons or other devices which could be employed to hijack an airliner. He also testified that he knew he did not have to go through the checkpoint and did not have to board the plane, or that he did not have to carry this suitcase onto the plane. He willingly chose to do so and thereby consented to the search of his person and baggage for the limited purpose of discovering weapons, explosives, or other devices which could be utilized to hijack an airplane. The fact that drugs instead of weapons were found, however, does not require their suppression since the search was proper. See Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); United States v. Skipwith, 482 F.2d 1272 (5th Cir.1973).
Alternatively, even in the absence of consent, this limited security boarding area search would not have violated Shapiro's fourth amendment rights. The fourth amendment provides that the people are entitled to be secure from unreasonable searches and seizures. The specific content and incidents of the fourth amendment guarantee are shaped by the context in which it is asserted. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To assess the reasonableness of security checks at airport boarding areas, we must balance the governmental interest justifying the governmental intrusion against the invasion which occurs as a result of the search. See Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
As a result of serious problems caused by airplane hijackings, the government developed screening procedures to detect potential hijackers prior to their boarding the airplane. The governmental interest in these screening procedures is to prevent the carrying of weapons or explosives aboard an aircraft and thereby to prevent jeopardy to hundreds of lives and millions of dollars of property at the hands of a lunatic, extortionist, political terrorist, or political refugee. The intrusion resulting from these *349 procedures is minimal compared to the monumental governmental interest involved. Tragic experience has taught us that in order to protect the prospective victims of violence, the hijacker must be discovered on the ground and before he boards the airplane. There is a very limited period of time in which the authorities can act to detect a possible hijacker. Security searches in the boarding area are the least intrusive possible because they are aimed at only those boarding the airplane and only those who could pose imminent danger to the air passengers, crew, and aircraft. Furthermore, the intrusion is minor because no stigma attaches when a person is searched at a known designated airport search point and because the person subject to the search voluntarily enters the search area and can avoid the search by not entering the boarding area. See United States v. Skipwith. Cf. United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).
Courts have generally held that airport security measures, such as the search in the present case, instituted to detect a prospective hijacker, are reasonable and constitutionally justified as a limited and relatively insignificant intrusion of privacy viewed against the grave necessity to protect an aircraft and its passengers and crew. See United States v. Edwards, 498 F.2d 496 (2d Cir.1974); United States v. Cyzewski, 484 F.2d 509, 512 (5th Cir.1973), cert. dismissed, Cyzewski v. United States, 415 U.S. 902, 94 S.Ct. 936, 39 L.Ed.2d 459 (1974); United States v. Moreno, 475 F.2d 44 (5th Cir.1973), cert. dismissed, Moreno v. United States, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973).
In United States v. Skipwith, the United States Circuit Court of Appeals, Fifth Circuit, held that the nonprobable cause search of Skipwith, who had presented himself for boarding at the Eastern Air Lines boarding gate at the Tampa International Airport, was lawful and that the contraband uncovered by the search was properly admitted into evidence. Initially, the Court pointed out that Skipwith knew or should have known that he was subject to being searched after presenting himself in the boarding area and explained:
His only reason for being there had to be to board the aircraft. Because of the widespread publicity given to the government's efforts to cope with the piracy of aircraft, it was general knowledge that citizens boarding planes were subject to special scrutiny and to weapon searches... . [T]he officer did not go to Skipwith and stop and search him at a point where such a procedure was extraordinary or unexpected. Rather, Skipwith came to the specific part of the airport where he knew or should have known all citizens were subject to being searched.
482 F.2d at 1274. Employing a test of reasonableness in upholding the search of Skipwith, the Fifth Circuit emphasized that "reasonableness" requires courts to weigh more than the necessity of the search in terms of possible harm to the public. Courts must also take into account the likelihood that the search procedure will be efficacious in averting the potential harm. It stated that balanced against public necessity and efficacy of the search are the degree and nature of intrusion into the privacy of the person and effects of the citizens which the search entails. Weighing these three factors determinative of reasonableness, the Fifth Circuit acknowledged the necessity to ensure that the potential harms of air piracy are foiled and found that the airport boarding area search procedures have every indicia of being the most efficacious possible. Although recognizing that the intrusion may be inconvenient and annoying, the Fifth Circuit held that this particular type of search was less offensive to the searched person than similar searches in other contexts and that the circumstances under which these searches were conducted made abuses much less likely to occur. The court explained:
Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny *350 of the traveling public. Moreover, the airlines, which have their representatives present, have a definite and substantial interest in assuring that their passengers are not unnecessarily harassed. The officers conducting the search under these circumstances are much more likely to be solicitous of the Fourth Amendment rights of the traveling public than in more isolated, unsupervised surroundings.
482 F.2d at 1276.
The Fifth Circuit rejected Skipwith's argument that even if a weapon discovered during his search could have been introduced into evidence, the cocaine seized should have been excluded since the search was not and could not properly have been conducted for the purpose of discovering illicit drugs and stated:
The strictures of the Fourth Amendment protect the citizen from unwarranted and unreasonable intrusion by the government on his person or into his effects. The rule excluding the admission of illegally obtained evidence was designed to effectuate this purpose by removing the principal incentive to conduct illegal searches. The rule does not exist because the evidence is not probative, or to chastise errant law officers, or to benefit the accused.
[I]t is important to note that the imposition which must be considered is the intrusion on a citizen's right to be free of unreasonable searches, not upon any right to be free of criminal prosecution. Certainly the imposition of a criminal penalty for possession of drugs found during an airport search will burden the one on whom it is imposed; constitutionally speaking, however, he has suffered only the same intrusion as other passengers who were searched. Although the discovery of cocaine in a search for weapons may be unexpected by the government, there is nothing in the Constitution that gives the apprehended felon a right to complain because the product of the protective action was not anticipated. Such a result cannot properly be classified as a windfall. It is the product of valid police work. The government has no duty to catch a carrier of dope sportingly or according to any game book rule. Nor is it material whether the circumstances leading to the discovery of the cocaine were of the defendant's making; all that matters is that the search be legally conducted.

482 F.2d at 1277-78 (emphasis added).
We hold that these searches are reasonable if conducted solely for the purpose of discovering whether a prospective air passenger poses an immediate threat to air commerce. Although the initiating purpose of the search is limited to the detection of a would-be hijacker, the search may be extensive because the airplane hijacker's weaponry could be any of a number of easily concealed things including plastic explosives or gasoline. The fact that an object was not metal and therefore did not set off the magnetometer at the security boarding station does not mean the search must end at that point. See United States v. Bell, 464 F.2d 667 (2d Cir.1972), cert. denied, Bell v. United States, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). So long as the object of the search is prevention of an airplane hijacking, the search is reasonable and proper and does not require probable cause for its foundation. But, as Judge Clark said in United States v. Skipwith:
[c]ertainly all citizens look forward to the day when skyjackings and their sequels, airport search and security measures, cease. When the threat of air piracy disappears the standards of reasonableness which we here recognize will go with it. Until that time arrives, however, the portent for evil supplies the requisite Fourth Amendment reasonableness to justify the search of any person who presents himself at a boarding gate to enter an aircraft.
482 F.2d at 1279.
In view of our holding that probable cause was not a prerequisite to this limited search in the security boarding area of the airport, we need not reach the question of whether, under the facts of this case, the detective actually had probable cause to search.
*351 Accordingly, we hold that section 893.13 and section 893.03(2)(a)(4) are constitutional. We further hold that the trial court properly denied Shapiro's motion to suppress evidence found as a result of a search by a detective of the Dade County Safety Department initiated to ensure that Shapiro was not a prospective airplane hijacker. When a valid "hijack" search takes place, evidence of another crime discovered during the search is admissible. The judgment and sentence are affirmed.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON and McDONALD, JJ., concur.
ADKINS, J., dissents with an opinion with which ENGLAND, J., concurs.
ADKINS, J., dissenting.
The facts are not disputed. I disagree with the conclusions of law made by the trial judge and by the majority opinion here. Inasmuch as I believe the motion to suppress should have been granted, I decline to reach the constitutionality of the statutes. Singletary v. State, 322 So.2d 551 (Fla. 1975).
As with virtually all search and seizure issues, the factual circumstances are of utmost importance. Viewed in the light most favorable to the state, State v. Nova, 361 So.2d 411 (Fla. 1978), the record from the hearing on the motion to suppress reveals the following facts.
On December 29, 1977, the appellant (hereinafter referred to as the defendant) arrived at the Miami International Airport with two other men, Scarborough and Krausey. After purchasing tickets, the defendant either helped or actually placed a bag in a coin-locker, then gave a key to Krausey in a manner which attracted the attention of a detective of the Dade County Public Safety Department's Organized Crime and Narcotics Section. The detective approached the defendant and asked for identification, whereupon the defendant produced a Texas driver's license in his own name and an airline ticket in another. When questioned about the discrepancy, the defendant became nervous and said the airlines made a mistake. As to the locker, the defendant said Krausey had gone to a ticket counter to leave the key for a man named Dean. This was verified by the ticket agent who said she had referred Krausey to another airline. Krausey could not be located. The detective asked the defendant twice for consent to search his hand luggage; the defendant refused both requests. By this time the detective felt that the defendant exhibited many characteristics of the so-called drug-courier and hijacker profiles. See United State v. McCaleb, 552 F.2d 717 (6th Cir.1977). The bare fact that one fits a profile does not provide a reasonable basis for an investigative detention. United States v. Mendenhall, 596 F.2d 706 (6th Cir.1979); United States v. Ballard, 573 F.2d 913 (5th Cir.1978). Concluding that they had no reason to detain the defendant any longer, the officers permitted him to leave.
The detective and his co-worker followed the defendant to the security check station. The guard viewing the monitor testified that when the defendant's bag went through, everything was clear except for something that looked like scissors. She drew this to the attention of her supervisor and passed the bag through again. Both security guards testified that all they observed on the screen was a pair of scissors. The detective claimed he saw a grey mass in the center of the screen. The supervisor asked the defendant if she could open the bag to check the scissors. The defendant consented, opened his bag, showed her the scissors and was told he could proceed. As the defendant moved his bag down the table to close it, the detective reached over, opened the suitcase further, and quickly lifted a pair of folded jeans causing a bag of cocaine to drop to the floor.
Airport searches have received considerable attention since the late 1960's because of the frequency of skyjacking, which posed a severe threat to public safety. See e.g. United States v. Moreno, 475 F.2d 44 (5th Cir.1973); United States v. Lopez, 328 F. Supp. 1077 (E.D.N.Y. 1971). This menace *352 engendered the development of screening procedures to detect potential hijackers prior to boarding the aircraft. See 3 W.R. LaFave Search & Seizure, A Treatise on the Fourth Amendment, section 10.6(a)-(g) at 327-56 (1979). Under the current system all persons entering the boarding area and their effects are mechanically checked. A practical ramification of this 100% screening process is that persons with contraband in their carry-on luggage may be apprehended. United States v. Davis, 482 F.2d 893 (9th Cir.1973). Care must be taken to see that these routine airport inspections do not become vehicles by which otherwise impermissible searches and seizures are validated.
In the case at bar, the detectives were on duty as organized crime and narcotics officers. They admittedly did not have probable cause to arrest or search the defendant after the initial encounter in the terminal area. They followed him to the screening area. One detective admonished the security guard to check defendant's bag carefully. He also positioned himself to view the monitor as the bag passed through. The defendant had been cleared by the security guards when the detective reached for the blue jeans in the partially-opened suitcase. The detective's testimony that he saw a grey mass on the X-ray monitor and feared an explosive device is untenable in light of his expertise and his actions. Cf. United States v. Scott, 406 F. Supp. 443 (E.D.Mich. 1976). Seizing the clothing so as to cause the concealed item to drop to the floor is not consistent with the caution one should exhibit in the presence of a putative bomb.
The officer's conduct must be gauged by established Fourth Amendment principles. A warrantless seizure of the jeans clearly occurred. At no time did the defendant consent to a search by the detective. Cf. Myles v. State, 374 So.2d 83 (Fla. 3d DCA 1979); Husted v. State, 370 So.2d 853 (3d DCA 1979). No contraband was in plain view. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The defendant was in the process of closing his bag when the officer reached in; there was no evidence that the bulge represented an immediately accessible weapon. McNamara v. State, 357 So.2d 410 (Fla. 1978).
The state contends that the detective's knowledge of the immediately preceding events gave him a "founded suspicion" that the bag contained a weapon or explosive and that this justified the seizure pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In Terry; the Supreme Court applied a balancing test to justify an officer's detention and "frisk" or "pat-down" of a defendant's person for a weapon upon less than the traditional probable cause standard. The Court weighed the danger to the officer against the degree of intrusion involved in a pat-down type search. Terry is inapplicable to the case at bar. The officer did not testify he believed the defendant was armed or presently dangerous except that there might be a bomb, in which case his actions only increased the danger. There is no reason to judge his conduct by less than a probable cause to search standard. Applying that standard to the instant facts, I find no support for a warrantless seizure of the defendant's clothing. All this officer knew was that the defendant fit a profile, he was nervous, and a grey mass appeared on the monitor. Neither of the trained security guards saw the grey mass and the defendant cleared airport security. At most, the officer had a suspicion that something was amiss. State v. Stevens, 354 So.2d 1244 (Fla. 4th DCA 1978).
The trial court did not enter a written order denying the motion to suppress. The ruling consisted of the following:
The Court: I say, in this issue, as in the case of most issues, the law of common sense is the prevailing one.
It would be, I think, to disregard common sense to hold that a reasonable person in this officer's position, knowing what this officer knew, did not have reasonable grounds to believe, as a man of reasonable cause of action [sic], that an offense had been committed.
Therefore, I will deny the motion to suppress.
*353 This is the appropriate standard for ascertaining the validity of a warrantless arrest, not a warrantless seizure. See State v. Doe, 115 N.H. 682, 371 A.2d 167 (1975).
The sentence should be vacated, the conviction reversed, and the cause remanded to the trial court for further proceedings.
ENGLAND, J., concurs.